# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **DECEMBER 21, 2015**

**NO. 33,990**

**STATE OF NEW MEXICO, ex rel.**
**CHILDREN, YOUTH and FAMILIES**
**DEPARTMENT,**

Petitioner-Appellee,

v.

**YODELL B.,**

Respondent-Appellant,

and

**IN THE MATTER OF TYRELL B.,**

a Child.

**APPEAL FROM THE DISTRICT COURT OF CIBOLA COUNTY**
**John F. Davis, District Judge**

Charles E. Neelley, Chief Children's Court Attorney
Kelly P. O'Neill, Assistant Children's Court Attorney
Albuquerque, NM

for Appellee

Robert E. Tangora, L.L.C.
Robert E. Tangora
Santa Fe, NM

for Appellant

Begaye Law Firm
Catherine A. Begaye
Albuquerque, NM

Guardian Ad Litem for Child

**OPINION**

**ZAMORA, Judge.**

{1}     Yodell B. (Father) appeals the termination of his parental rights to T.B. (Child). Father argues the evidence presented at the termination of parental rights trial (TPR) was insufficient to support the district court's finding that the Children, Youth, and Families Department (the Department) made active efforts to provide him with remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, and that those efforts were unsuccessful as is required by 25 U.S.C. § 1912(d) (2013) of the federal Indian Child Welfare Act, 25 U.S.C. §§ 1901 to 1963 (2013) (the ICWA). We hold that the evidence presented at the TPR was insufficient to show the Department complied with the active efforts requirement of 25 U.S.C. § 1912(d). Because a showing of active efforts is a mandatory predicate to the termination of parental rights under the ICWA, we reverse the district court's termination order and remand for proceedings consistent with this Opinion.

**BACKGROUND**

{2}     On October 18, 2011, the Department filed a neglect/abuse petition against Colynn B. (Mother) and Father regarding Child, an enrolled member of the Navajo Nation. Child was taken into the Department's custody due to injuries Child sustained in Mother's care and concerns regarding Mother's mental health. At the time Child

was taken into the Department's custody, Mother had been hospitalized for psychiatric treatment and Father's whereabouts were unknown to the Department.

{3}     A custody hearing was held on November 1, 2011. Because Mother was not able to safely care for Child at that time and the Department was unable to locate Father as a possible placement, the district court ordered Child to remain in the Department's custody. On January 19, 2012, the adjudication was scheduled; however, Father still had not been located.

{4}     Father was served with the neglect/abuse petition on February 22, 2012. The same day, Father met with the Department's permanency planning worker and together the two developed Father's treatment plan. The treatment plan required Father to be assessed for drug and alcohol abuse, parenting skills, and domestic violence. Father was also required to complete parenting and domestic violence programs. The permanency planning worker discussed with Father some service providers in or near Crownpoint, New Mexico, where Father lived. Father was responsible for setting up services and ensuring that appropriate release forms were signed so the Department could verify his receipt of services and for ensuring the service providers updated the permanency planning worker on Father's progress. Father's treatment plan also required that he participate in visitation with Child as

2

arranged by the Department, engage in education and/or employment, maintain a safe and stable home, and keep in contact with the Department.

{5} On April 13, 2012, the second adjudication was held and Father entered a plea of no contest to the allegations of neglect in the neglect/abuse petition, pursuant to NMSA 1978, Section 32A-4-2(E)(2) (2009). Father was not present for permanency hearings held on August 15, 2012, or November 21, 2012. At the August 15, 2012 hearing, the permanency planning worker reported that Father was attempting to set up services in compliance with his treatment plan, but that he was experiencing difficulty. At the November 21, 2012 hearing, the permanency planning worker reported that Father was participating in a parenting program, but that he had not completed any of the other items on his treatment plan. She also stated that Father contacted her once to set up visitation, but that the visit could not be coordinated with the foster parents, and Father did not contact her again to set up visitation. After the hearing, the district court changed Child's permanency plan to adoption with a concurrent plan of reunification.

{6} On September 11, 2013, the Department filed a motion to terminate parental rights of Mother and Father. The TPR was held on March 7, 2014. Notice of the trial was sent to Father's attorney on October 21, 2013. At the beginning of the TPR, Father's attorney moved for a continuance because she had been unable to contact

Father until two days before the hearing. The district court denied the motion. Mother voluntarily relinquished her rights, and the trial proceeded on the termination of Father's rights. At the conclusion of the trial, the district court determined that the Department's motion to terminate should be granted and it terminated Father's parental rights in the Child. This appeal followed.

**DISCUSSION**

{7}     On appeal, Father argues that the district court erred in denying the motion to continue the TPR. He also challenges the sufficiency of the evidence to support the termination of his parental rights. Specifically, Father claims there was insufficient evidence of neglect and abandonment and that there was insufficient evidence of the Department's active efforts to prevent the breakup of the family as required by 25 U.S.C. § 1912(d). Because our holding that the Department's failure to present sufficient evidence of active efforts at the TPR is dispositive of this appeal, we do not address Father's other arguments.

**The Active Efforts Requirement**

{8}     Under the ICWA, a party seeking to terminate parental rights "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d). In reviewing for

sufficient evidence of active efforts, our role "is to determine whether the fact[-]finder could properly conclude that the proof requirement below was met." *State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 22, 132 N.M. 299, 47 P.3d 859. Unlike 25 U.S.C. § 1912(e) and (f), 25 U.S.C. § 1912(d) does not specify the standard of proof applicable to the active efforts requirement. *See* 25 U.S.C. § 1912(e) ("No foster care placement may be ordered in such proceeding in the absence of a determination, supported by *clear and convincing evidence*, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (emphasis added)); 25 U.S.C. § 1912(f) ("No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence *beyond a reasonable doubt*, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (emphasis added)). Section 1912(d) also does not define the term "active efforts."

**{9}** New Mexico caselaw pertaining to the ICWA's active efforts requirement also does not resolve either of these issues. For example, in *In re Esther V.*, our Supreme Court reversed an adjudication of neglect and remanded for a new adjudicatory

5

hearing, holding that the district court was required to make findings as to the department's compliance with 25 U.S.C. § 1912(d) and (e), at the adjudication stage of abuse and neglect proceedings. *In re Esther V.*, 2011-NMSC-005, ¶¶ 36, 46, 149 N.M. 315, 248 P.3d 863. In *State ex rel., Children, Youth & Families Department v. Casey J.*, this Court addressed whether deviation from the ICWA's placement preferences constituted a violation of the active efforts requirement. 2015-NMCA-088, ¶¶ 14-15, 355 P.3d 814. We held that "the provision of remedial services and rehabilitative programs under [25 U.S.C.] § 1912(d) supports the continued custody that is protected by [25 U.S.C. § 1912(e), (f)]. It does not apply to facilitate the placement of the child in compliance with the placement preferences listed in [25 U.S.C.] § 1915." *Casey J.*, 2015-NMCA-088, ¶ 14 (alteration, internal quotation marks, and citations omitted).

{10}     *State ex rel. Children Youth & Families Department v. Arthur C.*, is the only New Mexico case in which a parent, whose parental rights were terminated, challenged the district court's finding that the active efforts requirement had been met. 2011-NMCA-022, ¶¶ 41-45, 149 N.M. 472, 251 P.3d 729. In that case, the district court found beyond a reasonable doubt that the department made active efforts to provide remedial services and rehabilitative programs to prevent the breakup of the Indian family and such efforts were unsuccessful. *Id.* ¶ 8. Because the evidence was

6

sufficient to establish the department's active efforts under the standard applied by the district court, and because the standard was not challenged on appeal, the question of whether the district court applied the appropriate standard was not addressed on appeal. *Id.* ¶ 45; *see Fernandez v. Farmers Ins. Co. of Ariz.*, 1993-NMSC-035, ¶ 15, 115 N.M. 622, 857 P.2d 22 ("The general rule is that cases are not authority for propositions not considered." (internal quotation marks and citation omitted)).

{11}     In the present case, like in *Arthur C.*, the district court determined that the evidence established, "beyond a reasonable doubt," that the active efforts requirement was met. Although Father does not challenge the evidentiary standard applied by the district court, our review of the record indicates that the evidence of active efforts presented at the TPR is not sufficient to satisfy the heightened standard applied by the district court. In order to determine if reversal is appropriate, we must determine the standard of proof by which the evidence of active efforts is to be evaluated and consider the nature and extent of the active efforts required under 25 U.S.C. § 1912(d).

**The Applicable Standard of Proof**

{12}     State courts have applied two different standards of proof when determining whether the active efforts requirement has been met. Some courts apply the reasonable doubt standard based on the heightened burden required for termination

7

under 25 U.S.C. § 1912(f) and to advance the Congressional purpose of protecting the Indian family. *See In re Welfare of M.S.S.*, 465 N.W.2d 412, 418 (Minn. Ct. App. 1991) ("If termination of parental rights of Indian parents to their children can be ordered only upon a factual basis shown beyond a reasonable doubt, and if termination cannot be effected without a showing of active efforts to prevent the breakup of the Indian family and a failure thereof, then the adequacy of efforts [predicating] termination, must likewise be established beyond a reasonable doubt." (citations omitted)); *see also In re G.S.*, 2002 MT 245, ¶ 33, 312 Mont. 108, 59 P.3d 1063 ("[G]iven the intent of Congress in preserving Indian families and this [s]tate's commitment to preserving Indian culture, we conclude that the proper evidentiary standard for determining 'active efforts' under [25 U.S.C.] § 1912(d) is the same standard we apply to the underlying ICWA proceeding.").

{13}     Courts in other jurisdictions have rejected the reasonable doubt standard, recognizing that if Congress intended to impose a heightened burden of proof for the active efforts element in 25 U.S.C. § 1912(d), it could have done so as it did in 25 U.S.C. § 1912(e), (f). *See Valerie M. v. Ariz. Dep't of Econ. Sec.*, 198 P.3d 1203, ¶¶ 16-17 (Ariz. 2009) (en banc); *In re Michael G.*, 74 Cal. Rptr. 2d 642, 648 (Ct. App. 1998); *In re C.A.V.*, 787 N.W.2d 96, 100-01 (Iowa Ct. App. 2010); *In re JL*, 770 N.W.2d 853, 863 (Mich. 2009); *In re Interest of Walter W.*, 744 N.W.2d 55, 60-61

(Neb. 2008); *In re Adoption of R.L.A.*, 2006 OK CIV APP 138, ¶ 18, 147 P.3d 306; *In re Vaughn R.*, 2009 WI App 109, ¶ 46, 320 Wis. 2d 652, 770 N.W.2d 795.

{14}     Those and many other jurisdictions have adopted the clear and convincing standard as more appropriate for termination of parental rights under state law. *See In re C.A.V.*, 787 N.W.2d at 100 (stating that the state version of the ICWA requires that active efforts be shown by clear and convincing evidence); *In re JL*, 770 N.W.2d at 863 (applying the "default" state standard of clear and convincing evidence); *In re Annette P.*, 589 A.2d 924, 928 n.8 (Me. 1991) (applying a clear and convincing standard "[b]ecause the federal guidelines should be interpreted to change state law to the least extent possible"); *In re Vaughn R.*, 2009 WI App 109, ¶¶ 41-42, 51 (holding that Congress intended no particular standard and thus, the state standard of clear and convincing evidence applies). *But see K.N. v. State*, 856 P.2d 468, 476 (Alaska 1993) (applying the state standard of preponderance of the evidence to the active efforts requirement).

{15}     We also note that "when interpreting either statutes or procedural rules, courts generally are reluctant to expand their scope or to imply requirements that have not been made explicit." *Yvonne L. v. Ariz. Dep't of Econ. Sec.*, 258 P.3d 233, ¶ 25 (Ariz. Ct. App. 2011); *see Elonis v. United States*, ___ U.S.___, ___, 135 S. Ct. 2001, 2023 (2015) ("We ordinarily resist reading words or elements into a statute that do not

9

appear on its face[.]" (alteration, internal quotation marks, and citation omitted)); *see also High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599 ("[T]he court will not read into a statute or ordinance language [that] is not there, particularly if it makes sense as written." (internal quotation marks and citation omitted)).

{16} Based on the foregoing, we are persuaded by the reasoning of the majority of the courts and therefore hold that the proper standard of proof for determinations under 25 U.S.C. § 1912(d) is the clear and convincing standard, which is applicable to the underlying termination of parental rights proceedings under NMSA 1978, Section 32A-4-29(I) (2009).

**Active Efforts**

{17} The majority of jurisdictions that have considered the extent of active efforts required under the ICWA find it useful to draw a distinction between active and passive efforts. The Alaska Supreme Court has held:

> Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts, the intent of the drafters of the Act, is where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own.

*A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (internal quotation marks and citation omitted); *see In re Welfare of Child of E.A.C.*,

812 N.W.2d 165, 174 (Minn. Ct. App. 2012) (defining active efforts as "a rigorous and concerted level of case work that uses the prevailing social and cultural values, conditions and way of life of the Indian child's tribe to preserve the child's family and to prevent placement of an Indian child" (internal quotation marks and citation omitted)); *In re A.N.*, 2005 MT 19, ¶ 23, 325 Mont. 379, 106 P.3d 556 ("The term active efforts, by definition, implies heightened responsibility compared to passive efforts. Giving the parent a treatment plan and waiting for him to complete it would constitute passive efforts."); *In re J.S.*, 2008 OK CIV APP 15, ¶ 16, 177 P.3d 590 (stating that active efforts requires more than pointing the parent in the right direction, it "requires 'leading the horse to water' ").

{18}     Many jurisdictions have held that the active efforts requirement imposes a greater burden than the reasonable efforts requirement of various states. *See In re J.S.*, 2008 OK CIV APP 15, ¶ 14 (recognizing that the majority of other states' courts that have interpreted the ICWA have held that the "active efforts" standard requires more effort than the "reasonable efforts" standard in non-ICWA cases); *In re C.D.*, 2008 UT App 477, ¶ 34, 200 P.3d 194 (accord). This view is consistent with the description of active efforts included in the recently issued Bureau of Indian Affairs Guidelines (BIA Guidelines) which explain that "[a]ctive efforts are intended primarily to maintain and reunite an Indian child with his or her family or tribal community and

constitute more than reasonable efforts as required by Title IV-E of the Social Security Act (42 U.S.C. 671(a)(15))." BIA Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10146-02, at 10,150 (Feb. 25, 2015).

{19} The BIA guidelines also provide several examples of active efforts including in relevant part: (1) "[i]dentifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services"; (2) "[o]ffering and employing all available and culturally appropriate family preservation strategies"; (3) "[c]ompleting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal"; (4) "[m]aking arrangements to provide family interaction in the most natural setting that can ensure the Indian child's safety during any necessary removal"; (5) "[i]dentifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or extended family in utilizing and accessing those resources"; (6) "[m]onitoring progress and participation in services"; (7) "[p]roviding consideration of alternative ways of addressing the needs of the Indian child's parents and extended family, if services do not exist or if existing services are not available";

12

and (8) "[s]upporting regular visits and trial home visits of the Indian child during any period of removal, consistent with the need to ensure the safety of the child." *Id.*

{20}    We find these authorities persuasive and we agree with the majority view that the term "active efforts connotes a more involved and less passive standard than that of reasonable efforts." *In re C.D.*, 2008 UT App 477, ¶ 34.

**Sufficiency of the Evidence of the Department's Active Efforts**

{21}    In reviewing for the sufficiency of the evidence of the Department's active efforts, "[w]e will uphold the district court's judgment if, viewing the evidence in the light most favorable to the judgment, a fact[-]finder could properly determine that the clear and convincing standard was met." *State ex rel. Children, Youth & Families Dep't v. Benjamin O.*, 2009-NMSC-039, ¶ 12, 146 N.M. 60, 206 P.3d 171 (internal quotation marks and citation omitted). "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact[-]finder's mind is left with an abiding conviction that the evidence is true." *State ex rel. Children, Youth & Families Dep't v. Hector C.,* 2008-NMCA-079, ¶ 11, 144 N.M. 222, 185 P.3d 1072 (internal quotation marks and citation omitted).

{22}    At the TPR, the Department's permanency planning worker testified she met with Father twice; once when Father's treatment plan was created in February 2012

13

and once in November 2012 at a family centered meeting. She only discussed Father's treatment plan with him once during their initial meeting. Father was told he would need to find a service provider to perform an alcohol severity index (ASI) assessment to determine the substance abuse services appropriate for Father, and Father would be required to follow any recommendations made after the completion of the ASI. Father was also told he needed to participate in domestic violence classes. Father and the permanency planning worker discussed one or two places in Crownpoint for Father to look into with regard to obtaining the services that were required by his treatment plan. Father was instructed to contact the service providers, arrange to receive services, provide the service providers with signed release forms, and have the providers send the permanency planning worker progress reports. According to the permanency planning worker, she never received information that Father had looked into or obtained any services as required by his treatment plan.

{23}    Concerning visitation with Child, the permanency planning worker informed Father that Child would be placed in foster care with Child's maternal grandmother in Arizona. She offered to have Child transported for visitation if Father could arrange for transportation to meet Child in Grants, Gallup, or Window Rock. Because Father did not have his own means of transportation, the permanency planning worker told Father that telephonic visits with Child may also be an option. She told Father

to contact her to arrange for either in person or telephonic visitation. The permanency planning worker did not hear back from Father so she did not make visitation arrangements. When the permanency planning worker attempted to call Father, she was unable to reach him using the telephone number she had been given. She attempted to obtain Father's contact information from Child's maternal grandmother and from the Navajo Nation, but she was unable to obtain a working number.

{24} Father acknowledged that he lost his phone and that he did not make subsequent efforts to stay in touch with the Department, or to contact the permanency planning worker regarding the requirements of his treatment plan. Father testified that the permanency planning worker arranged for him to take parenting classes, which he attended until the class location was changed. After that, Father did not know where the classes were being held and did not attend the remaining sessions. Father heard that there was a domestic violence program being offered at the hospital in Crownpoint. However, when Father went to the hospital he was unable to find information about the program.

{25} The Department argues the evidence that they prepared a treatment plan for Father, reviewed the treatment plan with Father, ensured Father understood the treatment plan, discussed potential service providers with Father, offered Father visits with Child, and contacted the Navajo Nation when Father failed to contact the

15

Department is sufficient to support the district court's determination that active efforts were made to provide Father with remedial services and rehabilitative programs designed to prevent the breakup of the family under 25 U.S.C. § 1912(d). We disagree.

{26} The testimony at the TPR demonstrates that the Department took the affirmative steps of meeting with Father to create a treatment plan, and referring Father to a parenting class. It appears the Department pointed Father in the direction of service providers, but did little else to assist Father in implementing the treatment plan. Father was not offered services aside from the one parenting class. The Department took a passive role by shouldering Father with the burden of not only independently locating and obtaining services, but also ensuring the service providers were communicating with the Department about his progress.

{27} The Department argues its efforts were reasonable and active, given Father's failure to maintain contact with the Department, and to meaningfully engage in his treatment plan and establish a relationship with Child. We recognize that in some circumstances continued efforts by the Department are not likely to alleviate the need for termination, and the ICWA does not require the Department to continue making active efforts indefinitely, where to do so would be futile. *See Wilson W. v. State*, 185 P.3d 94, 101 (Alaska 2008) ("If a parent has a long history of refusing treatment and

16

continues to refuse treatment, [Office of Children's Services] OCS is not required to keep up its active efforts once it is clear that these efforts would be futile."); *In re JL*, 770 N.W.2d at 867 ("The ICWA obviously does not require the provision of *endless* active efforts, so there comes a time when the [Department of Human Services] DHS or the tribe may justifiably pursue termination without providing additional services."); *In re C.D.*, 2008 UT App 477, ¶ 27 ("The ICWA requires active efforts to avoid the breakup of the Indian family *or* evidence that can support a finding that such efforts would be futile[.]" (emphasis added)).

{28}     However, a parent's failure to engage in or complete a treatment program does not excuse an initial failure by the Department to make active efforts. *See Wilson W.*, 185 P.3d at 101 ("We will decline to find active efforts where OCS develops a case plan, but the client must develop his or her own resources towards bringing it to fruition." (internal quotation marks and citation omitted)); *In re JL*, 770 N.W.2d at 868 ("Only if active efforts have been provided to prevent the breakup of the Indian family, and it does not appear that the provision of additional services is likely to prevent the need for termination, may the DHS or the tribe pursue termination without providing additional services.").

**CONCLUSION**

**{29}** We conclude that the Department did not present clear and convincing evidence that active efforts were made to prevent the breakup of the family. We reverse the district court's order of termination and remand for proceedings consistent with this Opinion.

**{30}** **IT IS SO ORDERED.**

_____
**M. MONICA ZAMORA, Judge**

**WE CONCUR:**

_____
**LINDA M. VANZI, Judge**

_____
**J. MILES HANISEE, Judge**